917 A.2d 746

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. STEVEN
R. FORTIN, DEFENDANT–RESPONDENT.

Argued September 26, 2006—Decided March 28, 2007.

582

*Nancy A. Hulett,* Assistant Prosecutor, argued the cause for appellant (*Bruce J. Kaplan,* Middlesex County Prosecutor, attorney).

*Michael A. Priarone,* Designated Counsel, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney; *Mr. Priarone* and *Cathy L. Waldor,* Designated Counsel, of counsel and on the brief).

*Justice ALBIN delivered the opinion of the Court.*

In the retrial of defendant Steven Fortin for the capital murder of Melissa Padilla, the State intends to prove defendant's guilt by showing that he committed the crime in such a distinctive way that it may be said to bear his "signature." The State seeks to introduce as "other crimes" evidence pursuant to *N.J.R.E.* 404(b) defendant's sexual assault of Maine State Trooper Vicki Gardner, whom he vaginally and anally penetrated, strangled, and bit on both the left breast and chin. The State argues that the peculiar bite marks to the left breast and chin found on Padilla's battered body, combined with injuries inflicted from anal penetration and manual strangulation, were akin to a signature that identified defendant as Padilla's killer. The State submits that jurors, relying on their common experience and general knowledge, need no expert testimony to conclude that the trademark bite injuries in both the Gardner and Padilla cases had a singular author—defendant. To bolster that conclusion, the State offers the results of a computer search of the FBI's Violent Criminal Apprehension Program (ViCAP), a national database of reported violent crimes that yielded three crimes with strikingly similar features—the Gardner and Padilla sexual assaults, and a sexual crime committed in Washington State.

In ruling on pretrial motions, the motion judge held that determining whether the Gardner and Padilla sexual assaults are signature crimes is beyond the general experience and knowledge of an ordinary juror and therefore requires expert testimony to explain those features that uniquely tie the two crimes together. The judge determined that the State could present the expert testimony of a medical examiner and forensic odontologist to establish the uniqueness of the bite marks suffered by both victims, provided those experts produce a reliable database to support their opinions. With regard to the attack on Trooper Gardner, the motion judge limited the State to the signature-crime evidence—the bite marks—finding that other details of the assault would be irrelevant and unnecessarily inflammatory. Last, the

judge concluded that because law enforcement authorities inserted the details of the Maine crime into the ViCAP database solely for the purpose of making an inexorable link between the Gardner and Padilla crimes, the ViCAP search results would not be admissible. The motion judge did allow the use of the ViCAP database, absent the Maine crime, as a means for supporting or attacking the reliability of the expert testimony.

We granted the State's motion for leave to appeal and now affirm the motion judge's ruling with the following modifications. The State must be permitted to present the bite-mark evidence in context and therefore *material* details of the Gardner sexual assault cannot be censored. Testimony describing that assault, however, is subject to specific jury instructions explaining the limited use of "other crimes" evidence under *N.J.R.E.* 404(b). Finally, because the State's experts have not relied on the ViCAP database to form their opinions, the ViCAP database should not be admissible to bolster those opinions.

## I.

### A.

We recount only those facts necessary for a resolution of the issues before us.[1] On the evening of April 3, 1995, Trooper Vicki Gardner stopped her patrol car to assist the driver of a vehicle parked on the shoulder of Interstate 95 in Maine. The driver, defendant Steven Fortin, smelled of alcohol. Trooper Gardner administered sobriety tests to Fortin and concluded that he was intoxicated. With defendant placed in the patrol car's front passenger seat beside her, Gardner radioed headquarters for back-up and began completing the paperwork related to the motor vehicle summonses she intended to issue to defendant.

After the passage of forty-five minutes and no back-up trooper in sight, defendant suggested that Gardner release him and just

---

[1] The facts are based on the record developed at defendant's 2000 trial.

go on her way. After she declined, defendant grabbed Gardner by the throat and slammed her head against the doorpost, causing her temporarily to lose consciousness. During the course of the vicious attack that ensued, defendant strangled Gardner and battered her face breaking her nose, and penetrated her vaginally and anally with his hand. Defendant also bit Gardner's left chin, left nipple, and the lateral side of her left breast.[2] When a trooper finally arrived, Gardner managed to break free, and defendant sped-off with her patrol vehicle.[3] Defendant was apprehended and later pled guilty to kidnapping, robbery, aggravated assault, assault on an officer, attempted gross sexual assault, unlawful sexual contact, and criminal operation of a motor vehicle under the influence of intoxicants. *State v. Fortin,* 318 *N.J.Super.* 577, 589, 724 *A.*2d 818 (App.Div.1999), *aff'd,* 162 *N.J.* 517, 745 *A.*2d 509 (2000) *(Fortin I).*[4]

After the assault on Gardner, the Maine State Police contacted the police in Woodbridge Township, New Jersey, where defendant had formerly resided. At the time, local police officers had reached a dead end in their investigation of the murder of Melissa Padilla whose ravaged body was discovered naked from the waist down in a concrete pipe alongside Route 1 in Woodbridge Township. On the evening of August 11, 1994, Padilla had been brutally beaten about the face and head, anally penetrated, and apparently strangled to death. Bite marks were found on her chin, left nipple, and left breast. The police determined that Padilla was sexually assaulted and killed shortly after leaving a

---

[2] During her trial testimony, Trooper Gardner described the details of the assault. Dr. Lawrence Ricci, who examined Trooper Gardner, explained the nature of her injuries.

[3] We add this last statement to complete the narrative. It was kept from the jury because its minimal probative value was outweighed by its prejudicial effect. *See State v. Fortin,* 318 *N.J.Super.* 577, 598, 724 *A.*2d 818 (App.Div.1999), *aff'd,* 162 *N.J.* 517, 745 *A.*2d 509 (2000) *(Fortin I).*

[4] Defendant received an aggregate twenty-year prison term for those crimes. *Id.* at 581, 724 *A.*2d 818.

Quick Chek store located approximately two blocks from the motel where she lived.

The police learned that defendant had been living at a different motel near the Quick Chek and had made a purchase there the day of the murder. The evening of Padilla's murder, defendant had fought with his girlfriend, Dawn Archer, during which he violently choked her, threw her to the ground, and kicked her. When Archer next saw defendant two days later, he had scratches under his left eye and multiple scratches on his neck and arms. In light of parallels between the Gardner and Padilla crimes, Woodbridge police detectives traveled to Maine to interview defendant. During questioning, defendant admitted that he had read about the Padilla murder in the newspaper. Confronted with the similarities between the Gardner sexual assault and the Padilla murder, defendant responded that "[i]f the evidence shows that I did it it would probably be the reason and I must have been involved." He added: "I'm not admitting anything. If the proof shows I did then I must have done it. I don't recall." In response to further questioning concerning the Padilla murder, defendant stated that he had no recollection. The police did not uncover any forensic evidence that linked defendant to the Padilla murder.

■ On September 6, 1995, a Middlesex County grand jury indicted defendant for capital murder, *N.J.S.A.* 2C:11–3a(1),(2); felony murder, *N.J.S.A.* 2C:11–3a(3); first-degree robbery, *N.J.S.A.* 2C:15–1; and first-degree aggravated sexual assault, *N.J.S.A.* 2C:14–2a. At trial, through the testimony of retired FBI agent Robert H. Hazelwood, an expert in the analysis of modus operandi [5] and ritualistic crimes,[6] the State sought to introduce the

---

[5] Modus operandi refers to the criminal's learned behavior that may change as a criminal modifies or adapts his behavior to a particular situation. *Fortin I, supra,* 162 *N.J.* at 522, 745 A.2d 509.

[6] Ritualistic aspects of a crime refer to the ways in which the perpetrator seeks sexual gratification. Unlike modus operandi, these aspects do not change. *Ibid.*

Gardner sexual assault as signature-crime evidence pursuant to *N.J.R.E.* 404(b). In *Fortin I, supra,* we determined that Hazelwood, as an expert in criminal investigative techniques, could testify to similarities between the crimes, provided he did not "draw[ ] conclusions about the guilt or innocence of the defendant." 162 *N.J.* at 528, 745 *A.2d* 509.

We specifically prohibited Hazelwood from "testify[ing] on the ultimate issue of whether the person that assaulted Trooper Gardner [was] the same person that murdered Melissa Padilla." *Id.* at 528–29, 745 *A.2d* 509. We expressed concern that Hazelwood's cutting-edge testimony, couched in the aura of behavioral science, might receive reflexive, uncritical acceptance by a jury. To enable verification of the crime-scene comparisons, we required that Hazelwood produce a "reliable data base" against which his premises could be fairly tested. *Id.* at 532, 745 *A.2d* 509. Writing for the majority, Justice O'Hern noted that "if [Hazelwood] can from *a reliable data base* offer evidence that a combination of bite marks on the breast, bite marks on the chin, and rectal tearing inflicted during a sexual attack is unique in his experience of investigating sexual assault crimes, that evidence could help to establish an 'unusual pattern.' " *Ibid.* (emphasis added).

Before the jury, Hazelwood compared the modus operandi and ritualistic characteristics of the Gardner and Padilla crimes and stated that "he had never seen, heard, or read of 'this combination of behaviors in any other crime.' " *State v. Fortin,* 178 *N.J.* 540, 582, 843 *A.2d* 974 (2004) (*Fortin II*). The State, however, did not comply with this Court's mandate to present a database of cases from which Hazelwood drew his conclusions. *Ibid.* Although defendant was found guilty of capital murder, we reversed his conviction because of the trial court's failure to adhere to our holding in *Fortin I* conditioning Hazelwood's testimony on the production of a reliable database. *Id.* at 584, 590, 843 *A.2d* 974.[7]

---

[7] We also reversed because the trial court improperly limited the scope of voir dire, fatally compromising the selection of a fair and impartial jury. *State v. Fortin,* 178 *N.J.* 540, 568–81, 843 *A.2d* 974 (2004) (Fortin II).

### B.

On retrial, the State seeks again to introduce the Gardner sexual assault as signature-crime evidence, but this time not through the testimony of an expert investigative crime profiler such as Hazelwood. At a pretrial hearing, the State argued that it was entitled to admit the Maine crime without expert testimony or, alternatively, through bite-comparison testimony of the medical examiner and an expert odontologist as well as through search results of the FBI's ViCAP database. At a hearing to determine the admissibility of the 404(b) evidence offered by the State, the motion judge took testimony from various expert witnesses. Dr. Lawrence Ricci, an expert in emergency medicine and pediatrics, testified that both Padilla and Gardner suffered traumatic anal injuries, but could not say that those injuries were any more distinctive than similar injuries inflicted on other sexual assault victims. The Middlesex County medical examiner, Dr. Geetha Natarajan, reported on the results of Padilla's autopsy, and noted that in her more than twenty-five years of conducting autopsies for the State she could not remember another case in which the victim suffered bite marks on the chin.

The State also offered the *Fortin I* pretrial and trial testimony of Dr. Lowell Levine, an odontologist. Dr. Levine stated that in his over thirty years of experience, he had never seen the combination of bite marks on the chin, the left nipple, and the left breast that appeared on both Gardner's and Padilla's bodies. He also offered his opinion to "a high degree of probability" that the bite mark on Padilla's left breast was caused by defendant's teeth.

In his testimony, FBI Supervisory Special Agent Mark Safarik described the Violent Criminal Apprehension Program, more commonly known as ViCAP. Created in 1984, ViCAP is a national database of approximately 167,000 reported violent crimes (homicides, attempted homicides, and kidnappings) maintained by the FBI in Quantico, Virginia. The database represents about three to seven percent of the violent crimes committed since ViCAP's inception. Participation in ViCAP nationwide is voluntary. Law

enforcement agencies that complete the ViCAP form answer numerous questions about the crime for inclusion in the national database.

The general purpose of ViCAP "is to identify similarities in crimes" through a computer search isolating particular characteristics in the commission of the offense. Through such a computer search focusing on specific crime criteria, one law enforcement agency can contact and cooperate with another agency working on a "similar case with similar characteristics." According to Agent Safarik, the "ViCAP system is looking for ... solved or unsolved homicides, or attempted homicides, missing persons cases, kidnappings, where there is a strong possibility of foul play, or unidentified dead bodies, where the manner of death is suspected to be homicide." [8] In the relevant time period, it does not appear that sexual assaults unrelated to kidnappings or homicides and attempted homicides were a targeted group for input into the ViCAP system.

Law enforcement authorities completed the ViCAP form for the Padilla murder in a timely manner for inclusion in the national database. The Maine State Police, however, did not complete a ViCAP form for the 1995 Gardner sexual assault. In 2004, in preparation for defendant's trial, the State requested that Agent Safarik submit a ViCAP form for the Gardner case. He did so with the assistance of a ViCAP analyst and the Maine State Police. Agent Safarik then ran a series of searches on the ViCAP system

---

[8] At the hearing below the State admitted into evidence a sample ViCAP form. The cover materials attached to the sample form instruct that the ViCAP Crime Analysis Report Form collects information on homicides/attempted homicides, missing persons/kidnappings, and unidentified dead bodies. Under "Case Type," the sample form lists the following categories that can be checked off: murder, attempted murder, unidentified dead body, missing person, and other. The ViCAP form submitted by the Middlesex County Prosecutor at the time of Padilla's murder likewise did not contain a check-mark box for sexual assaults. In a report prepared prior to the hearing, however, Agent Safarik wrote that in addition to the crimes he testified to, the ViCAP database is designed to collect sexual assault cases "especially those committed by a stranger, or are known or suspected to be part of a series."

for specific criteria common to both the Padilla and Gardner crimes, such as manual strangulation, sexual assault, and bite marks on the face and chest. The searches yielded only three cases—the Padilla murder, the Gardner sexual assault, and a 1988 case from Washington State. The State argued that the searches showed that the similarities between the Padilla and Gardner crimes were so unusual as to constitute a signature. Significantly, Agent Safarik indicated both that the ViCAP database could not be released to defense counsel because of privacy concerns and that it was exempt from the Freedom of Information Act.

Defendant presented the trial testimony of Dr. Norman Donald Sperber,[9] the Chief Forensic Dentist in the San Diego Medical Examiner's Office. Dr. Sperber, an expert odontologist, had expressed "doubts" whether the marks on Padilla's breast and chin were in fact bite marks. He also had indicated that even assuming the injuries to the breast and chin were bite marks, they were not caused by defendant's teeth.

Dr. Grover Godwin, who holds a doctorate in criminal investigative psychology, testified for the defense as an expert in the statistical evaluation of crime scenes. Dr. Godwin questioned the reliability of the comparison results of ViCAP based on what he perceived to be "a bias in entering the variables" into the database in this case.

The motion judge ruled that any comparative analysis of the two sexual assaults for the purpose of identifying them as signature crimes was beyond the ken of an ordinary juror and that the ViCAP database did not "provide[ ] independent support of a theory of uniqueness" between the two crimes. She therefore conditioned the admissibility of the Maine crime on expert testimony making the link between the two crimes.

In light of the State's presentation at the 404(b) hearing, the motion judge found that only the bite-mark testimony of Dr.

---

[9] Dr. Sperber's testimony was taken during defendant's original trial. By agreement of the parties, his testimony was adopted as part of the 2005 hearings.

Levine, the odontologist, and Dr. Natarajan, the medical examiner, "suggest[ed] a unique coexistence of any group of injuries or factors between the Maine offense and instant homicide." Based on their testimony, the motion judge indicated that a reasonable jury could conclude "the bite injuries to be similar and unique, such that they amount to a signature." Conversely, the judge reasoned that the other injuries inflicted on Gardner and Padilla were common to sexual assault offenses and did "little to add to the showing of [a] signature" crime. She determined that presentation of gruesome injuries would create undue prejudice and likely be used for the improper purpose of establishing "Mr. Fortin's propensity to brutal attacks."

Relying on our *Fortin II* decision, the motion judge required "the production of a reliable database as an essential qualifier" for the expert testimony of Dr. Levine and Dr. Natarajan. *See Fortin II, supra,* 178 *N.J.* at 584, 843 *A.*2d 974. That "reliable database" would be satisfied if those experts "present the defense with a compilation of the sexual assault and homicide cases with human bite marks on victims or a reasonable sampling of [such cases] from their experience." Thus, to support the claim that the bite mark injuries are unique, the experts could testify that from the thousands of cases they have reviewed in the course of their professional experience they have never before seen bite marks to the chin or breast on a sexual assault victim.

The motion judge also maintained that the ViCAP database might have applicability at trial. For instance, "[a]bsent the insertion of the Maine crime, [she found] that the ViCAP database would be a reliable database upon which the [S]tate may rely to test the expert opinions." With regard to the Gardner ViCAP form, she observed that it was prepared for litigation purposes and therefore "fail[ed] to provide an unbiased generation of data." Alternatively, she suggested that "if the ViCAP database could be crafted to report on the uniqueness of [the human bite mark] criteria alone," the database would then be helpful in proving "a signature like crime." To be useful, for example, the ViCAP

analysis would have "to determine how many, if any, cases involve bite marks on the chin." The judge noted, however, that the ViCAP forms do not contain a box for bite marks to the chin.

Thereafter, the Appellate Division denied the State's motion for leave to appeal the motion judge's rulings. The State then filed an interlocutory appeal to this Court. Defendant did not oppose the State's motion or file a cross-motion of his own with either the Appellate Division or this Court. We granted leave to appeal and now decide the issues raised by the State in its moving papers.

## II.

The State argues that the motion judge committed three errors. First, the judge conditioned introduction of the signature-crime evidence on expert testimony explaining the uniqueness of the bite marks in the Padilla and Gardner cases. Second, she would not admit evidence of the injuries suffered by Gardner other than the bite marks, thereby denying the jury the necessary context in which to determine whether the two crimes are indeed signature crimes. Last, she would not allow the ViCAP database to be used to show that a computer search revealed only three cases with the pattern of bite marks to the breast and chin—the Padilla and Gardner cases, and a Washington State case. We address each argument in turn.

## III.

### A.

In *Fortin I*, we resolved that evidence of defendant's sexual assault on Trooper Gardner was admissible through the expert testimony of investigative profiler Robert Hazelwood for the purpose of proving the identity of Melissa Padilla's killer. *Fortin II, supra,* 178 *N.J.* at 583 n. 5, 843 *A.2d* 974; *see N.J.R.E.* 404(b). We did not consider in *Fortin I* whether, absent expert testimony, the Gardner-other-crime evidence would be admissible to establish that the Padilla murder was the distinctive handiwork

of defendant. We now hold that the comparative analysis necessary to determine whether the Padilla murder and Gardner sexual assault are signature crimes is outside of the ordinary experience and knowledge of jurors and requires the assistance of expert testimony.

■ Signature-crime evidence falls within the category of other-crime evidence, which is governed by *N.J.R.E.* 404(b). That evidence rule provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.
>
> [*N.J.R.E.* 404(b).]

Other-crime evidence may not be admitted for the purpose of showing a defendant's propensity or predisposition to commit criminal acts; such evidence may only be offered to prove "a material issue in dispute." *Ibid.*

Consistent with *N.J.R.E.* 404(b), other-crime evidence may be presented to establish the identity of Padilla's killer. The State is permitted to prove that the crimes were committed in so distinctive and unusual a manner that they may be said to be the handiwork of the same person. *See Fortin I, supra,* 162 *N.J.* at 532, 745 *A.*2d 509 (citing *State v. Reldan,* 185 *N.J.Super.* 494, 502, 449 *A.*2d 1317 (App.Div.), *certif. denied,* 91 *N.J.* 543, 453 *A.*2d 862 (1982)). The State maintains that because the sexual assaults were carried out "in so nearly identical a method," leaving almost identical injuries on the victims, the two crimes bear defendant's unique signature. *See ibid.* (quoting *Reldan, supra,* 185 *N.J.Super.* at 502, 449 *A.*2d 1317). The State argues that whoever authored the brutal assault on Trooper Gardner must therefore be the perpetrator of the Padilla murder.

Courts have admitted signature-crime evidence to prove identity when the bizarre quality of the crime was self-evident. *See, e.g., State v. Porambo,* 226 *N.J.Super.* 416, 421–23, 544 *A.*2d 870 (App.Div.1988) (noting that defendant gained entry wearing beard

and mustache disguise, posing as firefighter in one assault and police officer in other); *State v. Sempsey,* 141 *N.J.Super.* 317, 323–24, 358 *A.*2d 212 (App.Div.1976) (explaining that assailant taped victims' eyes, wore headgear, was unable to obtain erection, smelled of grease, and on leaving, instructed victims to count or he would shoot), *certif. denied,* 74 *N.J.* 272, 377 *A.*2d 677 (1977); *see also State v. Roscoe,* 145 *Ariz.* 212, 700 *P.*2d 1312, 1317–18 (1984) (finding unique modus operandi in following circumstances: unclothed bodies found in remote areas, shoes placed side by side, blouses torn open in front, victims gagged by socks, hands tied behind back with articles of clothing, and indications of vaginal and oral sex), *cert. denied,* 471 *U.S.* 1094, 105 *S.Ct.* 2169, 85 *L.Ed.*2d 525 (1985). Conversely, when it is not obvious that the characteristics of a crime are unique, a court will not admit the other-crime evidence. *See, e.g., Reldan, supra,* 185 *N.J.Super.* at 503, 449 *A.*2d 1317 (commenting that use of force to victims' throat, standing alone, is not distinctly indicative of one person's handiwork); *Martin v. State,* 722 *S.W.*2d 172, 174 (Tex.App.1986) (explaining that grabbing victims from behind and attempting to remove their clothes is not signature-crime evidence).

In this case, the question is whether jurors using their common experience and general knowledge, without the assistance of expert testimony, can determine if the crimes committed against Gardner and Padilla are so distinctive that they bear defendant's unmistakable signature. Stated differently, without specialized knowledge or training, how would jurors know whether bite marks to the chin and breast of a female sexual assault victim are unremarkable or highly unusual? The motion judge held that "an ordinary juror would not be able to decipher the significance of specific injuries" inflicted on Gardner and Padilla. In reaching that conclusion, she noted that "Agent Safarik testified that the ability to analyze the uniqueness of violent and bizarre crimes is often beyond the capacity of an ordinary street detective." The judge allowed that with the expert testimony of Dr. Levine, an odontologist, and Dr. Natarajan, a medical examiner, a jury could find that the chin and breast bite marks on the two victims to be

so "similar and unique" that they may be said to be the equivalent of a signature.

Although jurors may draw rational inferences from the evidence, they are not permitted to speculate or connect the dots on mere surmise. The average juror cannot be expected to have the knowledge or experience to discern whether bite marks are a common or highly distinctive feature of violent sexual assaults. "The primary justification for permitting expert testimony is that the average juror is relatively helpless in dealing with a subject that is not a matter of common knowledge." *State v. Kelly,* 97 *N.J.* 178, 209, 478 *A.*2d 364 (1984); *see also N.J.R.E.* 702 (permitting expert testimony when "scientific, technical, or other specialized knowledge" will assist jury in understanding evidence or making factual determination). New Jersey courts have required expert testimony to explain complex matters that would fall beyond the ken of the ordinary juror. *See Buckelew v. Grossbard,* 87 *N.J.* 512, 526–27, 435 *A.*2d 1150 (1981) (requiring in medical malpractice case expert testimony to explain that injury to plaintiff's bladder during medical procedure raised inference of physician negligence); *Mullarney v. Bd. of Review,* 343 *N.J.Super.* 401, 408, 778 *A.*2d 1114 (App.Div.2001) (requiring expert testimony to explain effect of mental illness on behavior and judgment); *State v. Jones,* 308 *N.J.Super.* 174, 184–85, 705 *A.*2d 805 (App.Div.) (holding that in murder case in which victim's hyoid bone was not fractured in assault, expert testimony necessary to support inference that defendant applied minimal pressure to victim's neck), *certif. denied,* 156 *N.J.* 380, 718 *A.*2d 1209 (1998).

Thus, when the signature-like aspect of a crime would not be apparent to the trier of fact, expert testimony may be necessary to explain the significance of the evidence. *See, e.g., United States v. Crowder,* 87 *F.*3d 1405, 1413 (D.C.Cir.1996) (rejecting defendants' method of packaging drugs as signature crime and stating that "the Government presented no evidence, expert or otherwise, that the mode of packaging was distinctive to [defendant] or even unusual in the drug trade"), *vacated o.b. on other grounds,* 519

*U.S.* 1087, 117 *S.Ct.* 760, 136 *L.Ed.*2d 708 (1997). Similarly, when confronting signature-crime evidence, prosecutors or defendants may offer expert testimony in recognition that jurors are likely unfamiliar with arcane features of the crime. *See, e.g., United States v. Trenkler,* 61 *F.*3d 45, 49 (1st Cir.1995) (describing expert testimony offered by State and defendant on similarities and dissimilarities between bombs allegedly made by defendant); *State v. Russell,* 125 *Wash.*2d 24, 882 *P.*2d 747, 776 (1994) (affirming trial court's decision to permit expert testimony on rarity of killer posing dead bodies in seemingly distinctive ways due to jury's lack of "specialized knowledge"), *cert. denied,* 514 *U.S.* 1129, 115 *S.Ct.* 2004, 131 *L.Ed.*2d 1005 (1995).

We do not presume that the ordinary juror would have knowledge of the typical injuries inflicted during a violent sexual assault. Here, we do not have injuries that are so clearly distinctive or unusual that the signature-quality of the crimes would be self-evident to the untrained eye of the average juror. *See, e.g., Porambo, supra,* 226 *N.J.Super.* at 421–23, 544 *A.*2d 870; *Sempsey, supra,* 141 *N.J.Super.* at 323–24, 358 *A.*2d 212. For that reason, the State is required to provide expert testimony, such as the testimony offered by Dr. Levine and Dr. Natarajan, to explain the unique aspects of the Gardner and Padilla sexual assaults that would permit a jury to conclude that both crimes are the handiwork of the same person.

■ A trial court's determination on the admissibility of evidence in general and other-crime evidence in particular is entitled to great deference and ordinarily should not be disturbed unless it is "wide of the mark." *See State v. Marrero,* 148 *N.J.* 469, 484, 691 *A.*2d 293 (1997) (internal quotation marks omitted). We cannot find that the motion judge abused her discretion by conditioning the signature-crime evidence on the presentation of expert testimony.

### B.

■ We also find that the judge properly exercised her discretion by requiring the State to provide defendant with a database

of cases supporting the expert testimony of Dr. Levine and Dr. Natarajan. Just as we required the State in *Fortin I* to supply a database to support its expert investigative profiler's assertion that he had never seen before the congruence of characteristics that appeared in both the Gardner and Padilla crimes, the motion judge mandated the production of a database to support Dr. Natarajan's and Dr. Levine's testimony that neither had ever seen a case with such bite injuries. Quoting from our opinion in *Fortin II, supra,* the judge observed that the production of a "reliable database" would allow "the defense a fair opportunity to test [the experts'] methods and credibility in the crucible of cross-examination." 178 *N.J.* at 584, 843 *A.*2d 974. We add that our evidentiary rules provide trial courts with the authority to require pretrial disclosure of "the underlying facts or data" that support an expert's opinion. *See N.J.R.E.* 705 ("The expert may testify in terms of opinion or inference and give reasons therefor without prior disclosure of the underlying facts or data, *unless the court requires otherwise."* (emphasis added)).

 Thus, to ensure the fairness of the trial process, the motion judge appropriately ordered Dr. Levine and Dr. Natarajan to "present the defense with a compilation of the sexual assault and homicide cases with human bite marks on victims or a reasonable sampling of [such cases] from their experience." We fail to see the merit in the dissent's position that a trial court does not have authority in a capital case to order the production of the experts' data in accordance with *N.J.R.E.* 705. Significantly, the State's experts have not suggested that they did not rely on past cases in coming to their individual conclusions that the bite marks inflicted on Gardner and Padilla were unusual. Additionally, we are not aware of any claim that production of the underlying data before trial is unfeasible. Indeed, in compliance with the trial court's direction, the State has represented in its reply brief that Dr. Levine and Dr. Natarajan have provided data to the State on cases they have worked on involving bite marks and that this discovery has been turned over to the defense. In affirming the trial court's decision, we merely defer to a sound and unremarka-

ble evidentiary decision intended to ensure the fairness of the trial proceedings.[10]

## IV.

## A.

■ The motion judge also determined that other aspects of the Gardner assault, including the anal penetration, strangulation, and facial beatings were "common" to violent sexual assaults and thus added little "to the showing of [a] signature" crime. She thus forbade testimony about those "other injuries," fearing that undue prejudice would be caused by permitting evidence that had no purpose other than to establish defendant's "propensity to brutal attacks." We share the judge's concern that only relevant evidence should bear on the issues that must be decided by the jury. We disagree, however, that details of the Gardner assault can be so finely parsed. Although the other injuries suffered by Gardner do not fall into the category of signature evidence,[11] the bite marks were inflicted during a vicious sexual assault. That reality cannot be ignored or withheld from the jury without seriously distorting

---

10 Our dissenting colleague has dismantled an argument that is not even before the Court. The dissent characterizes the database as enabling the experts to "compare a 'known' bite-mark, that is, one for which the bite pattern or methodology is known to come from a specific person, with a 'questioned' bite-mark from someone not yet identified." *Post* at 610, 917 A.2d at 764. That is not the case. Dr. Levine testified that comparing the bite mark on Padilla's breast with dental impressions taken from defendant, he could identify defendant, to "a high degree of probability," as the source of the bite mark. Neither the trial court nor this Court has suggested that a database is necessary for that type of comparison. Rather, under *N.J.R.E.* 705, the motion judge ruled that a database is required to support the experts' conclusions that bite marks to the breast and chin are rare in sexual assaults.

11 The State did not present expert testimony at the pretrial hearing that classified any injury other than the bite marks as unique or highly unusual. No expert claimed that in his or her professional experience anal injuries, facial beatings, and manual strangulations are uncommon in violent sexual assaults. Indeed, the State's own expert, Dr. Ricci, testified that the anal injuries suffered by both women were not unusual.

the import of the bite-mark evidence. By its very nature, signature-crime evidence carries the potential for prejudice. Nevertheless, signature-crime evidence may be highly probative, and in this case, we conclude that its probative value is not outweighed by its prejudicial effect. *See State v. Cofield,* 127 *N.J.* 328, 338, 605 *A.*2d 230 (1992). Therefore, we will allow the State to present the bite-mark evidence within the general narrative of the sexual assault on Trooper Gardner.

Placing the bite-mark evidence in context will permit the jury to better fulfill its truth-seeking function. That approach benefits defendant as much as the State. Sanitizing the Gardner assault would keep from the jury the many differences between the two crimes that might lead it to reject the signature-crime evidence. The Appellate Division in *Fortin I* enumerated the various disparate characteristics that marked both crimes:

> Here, there is an attempt to link behavior in two crimes, under circumstances where there are as many differences as there are similarities, starting with the fact defendant was not charged with the attempted murder of Trooper Gardner. There are differences in the age, race, weight and height of the victims. There is a significant difference in the status of each victim. Trooper Gardner is a professional police officer and a potentially dangerous target for someone to perpetrate a crime against, particularly when defendant knew, prior to the assault, that his identity was made known to the state police dispatcher by Trooper Gardner. There are also differences in the type of assault. Trooper Gardner was anally and vaginally assaulted, while Padilla was assaulted anally, but not vaginally.

[*Fortin, supra,* 318 *N.J.Super.* at 608–09, 724 *A.*2d 818.]

Ultimately, it is better that the jury know not only the similarities, but also the differences between the Gardner and Padilla crimes. Moreover, to limit the entirety of the sexual assault on Trooper Gardner to the bite marks will likely lead the jury to speculate, perhaps to defendant's detriment, about the true nature of the crime. We thus conclude that screening from the jury material details of the Gardner assault that will make sense of the relevant signature-crime evidence will disserve the interests of a fair trial.

B.

Next, we cannot over-emphasize the importance of carefully crafted limiting instructions that explain how and for what purpose the jury is to consider the other-crime evidence in this case. "However probative other-crimes evidence may be to an issue in dispute, such evidence creates the strong potential for prejudice because of its natural 'tendency to demonstrate a criminal predisposition.'" *State v. Blakney*, 189 *N.J.* 88, 93, 912 *A.*2d 140 (2006) (quoting *State v. G.S.*, 145 *N.J.* 460, 468, 678 *A.*2d 1092 (1996)). Testimony concerning the savage sexual assault of a State Trooper will have the natural power to evoke a visceral response from the jury. It is the danger that such testimony "may indelibly brand the defendant as a bad person and blind the jury from a careful consideration of the elements of the charged offense that requires the trial court to deliver the limiting instructions in a way that the jury can readily understand." *Ibid.* The court's instruction "should be formulated carefully to explain precisely the permitted and prohibited purposes of the evidence, with sufficient reference to the factual context of the case to enable the jury to comprehend and appreciate the fine distinction to which it is required to adhere." *State v. Stevens*, 115 *N.J.* 289, 304, 558 *A.*2d 833 (1989). Additionally, the limiting instructions should be given both at the time the other-crime evidence is presented and in the final jury charge. *Blakney, supra*, 189 *N.J.* at 93, 912 *A.*2d 140.

Based on the testimony of Dr. Levine and Dr. Natarajan, the jury will consider whether the bite marks are so unusual and distinctive as to constitute a signature crime. The jury must be told that the State's experts do not posit that the other injuries—the anal penetration, facial beating, and manual strangulation of Gardner—are uncommon in a sexual assault, and therefore the jury should not consider those injuries as signature-crime evidence. To repeat, the court should identify the signature-crime evidence offered by the State and indicate with specificity the

purpose for which that evidence may be considered. *See Stevens, supra,* 115 *N.J.* at 309, 558 *A.*2d 833.[12]

## V.

■ Last, we address the admissibility of the crime-comparison searches run through the ViCAP database, which the State claims identified the Gardner and Padilla sexual assaults as a signature-crime match and therefore defendant as Padilla's killer. The motion judge rejected the State's position that the ViCAP matches could be used to support a theory that the Gardner and Padilla crimes were unique. She reasoned that the ViCAP database, at present, was not sufficiently crafted to isolate unique criteria. For example, she noted that the ViCAP data form had no boxes to check for bite marks to the chin. For that reason, she concluded that the overly broad factors listed in the ViCAP database did not permit a reliable uniqueness analysis. She also found that because the Gardner ViCAP form "was created for litigation purposes and was not within the regular course of police work," the match between the two crimes was not from "an

---

[12] We agree with the dissent that, generally speaking, "the greater the number of points of comparison available, the more reliable the identification made therefrom." *Post* at 612, 917 *A.*2d at 765–66. That being said, the comparisons in this case can only be made by experts with particularized skill and training. We have concluded that an expert is necessary to identify the characteristics common to the Padilla and Gardner crimes that are unusual in the universe of violent sexual assaults. We reached that conclusion because the comparison between the two crimes for identification purposes requires "specialized knowledge" not possessed by the average juror. Indeed, fingerprint analysis, the example used by the dissent, *see post* at 612–14, 917 *A.*2d at 766–67, involves an expert identifying points of comparison between a known and unknown print. *See generally State v. Cerciello,* 86 *N.J.L.* 309, 313–14, 90 *A.* 1112 (E. & A.1914). Of course, as the dissent states, the more points of comparison the more reliable a fingerprint identification. However, we do not allow the fingerprint expert to render an opinion that there are fifteen points of comparison and then allow the jury to play detective and find fifteen more comparison points. In this case, the State has not presented an expert offering an opinion on the uniqueness of any shared aspects of the two crimes other than the bite injuries. Therefore, the remaining details of the two crimes are not admissible on the issue of identity.

unbiased generation of data" and thus was inadmissible. Last, she determined that the ViCAP database, without the Gardner information, "would be a reliable database upon which the [S]tate may rely to test the expert opinions."

As mentioned earlier, ViCAP is a national database containing approximately 167,000 cases of homicide, attempted homicide, and kidnapping. Completion of a ViCAP form by a law enforcement agency is on a voluntary basis. Lawrence Nagle, the supervising investigator on the Padilla case in 1994, testified that at the time of the Padilla investigation, it was the practice of the Middlesex County Prosecutor's Office to fill out ViCAP forms only for unsolved crimes. Agent Safarik testified that various agencies follow different practices in determining when to complete a ViCAP form. The 167,000 cases in the database represent about three to seven percent of the homicides, attempted homicides, and kidnappings committed since 1984. The record does not reveal how many of those three to seven percent of cases were sexual assaults. Moreover, at least according to the ViCAP form's general instructions, ViCAP did not invite entries for violent sexual assaults falling outside of the categories of homicide, attempted homicide, or kidnapping. Accordingly, violent sexual assaults that did not end in a homicide, attempted homicide, or kidnapping may not be reflected in the ViCAP database. Viewed through that prism, the ViCAP database may only contain a very small fraction of the number of violent sexual assaults since 1984.

Significantly, although the State presented Agent Safarik to explain the functions of ViCAP, neither he nor any other expert witness vouched that a ViCAP crime match, such as the one in this case, constituted reliable signature-crime evidence.[13] Only one case has been brought to our attention in which a signature-crime match from the ViCAP database was found to be admissible, and

---

[13] Agent Safarik is an expert in criminal investigative analysis, and has over the course of his twenty-two-year career at the FBI been involved in over 5,000 homicide cases.

there the ViCAP searches were offered to support an expert's conclusion that the criminal behavior—posing bodies of murder victims in staged positions—was highly unusual. *Russell, supra,* 882 *P.*2d at 776–77. In that case, in addressing the defendant's contention that the trial court improperly admitted questionable statistical evidence, the Washington Supreme Court specifically noted that ViCAP was used solely to support the expert's claim that posing was a rare occurrence and that the expert relied more on case materials and personal expertise than on the database in forming a conclusive opinion. *Id.* at 777. Unlike in *Russell,* here the State seeks to introduce the search results of ViCAP as stand-alone evidence of defendant's guilt.

It is noteworthy that only through the importuning of the Middlesex County Prosecutor's Office, which was preparing for defendant's murder trial, did Agent Safarik input a ViCAP form for the nine-year old Gardner sexual assault. Thus, the Gardner ViCAP form was not submitted in the course of an ordinary investigative routine by the Maine State Police, but rather for litigation purposes—to find a match with the Padilla murder. Although the State maintains that the description of the Gardner crime on the ViCAP form is unassailable, it cannot be known in hindsight how the information would have been entered into the system for normal recordkeeping and investigative purposes. That is why the motion judge concluded that the State could not show that Agent Safarik's searches were based on "an unbiased generation of data."

■ We also note that the Gardner ViCAP form does not qualify under either the business records, *N.J.R.E.* 803(c)(6), or public records, *N.J.R.E.* 803(c)(8), exceptions to the hearsay rule. *N.J.R.E.* 803(c)(6) provides that a statement contained in a writing or record is admissible "if the writing or other record was made in the regular course of business and it was the regular practice of that business to make it." The Gardner ViCAP form was not filled out in the regular course of business—that is, by a Maine law enforcement official at the time the crime occurred in further-

ance of an investigation—but instead was completed by Agent Safarik, nine years after the sexual assault for the purpose of assisting the prosecution of defendant.

▮ Additionally, the public records exception to the hearsay rule does not apply. *N.J.R.E.* 803(c)(8)(A) permits the introduction of

a statement contained in a writing made by a public official of an act done by the official or an act, condition, or event observed by the official if it was within the scope of the official's duty either to perform the act reported or to observe the act, condition, or event reported and to make the written statement.

If any law enforcement agency would have been expected to fill out the ViCAP form on the Gardner assault, it would have been the Maine State Police at or about the time of the crime. Here, Agent Safarik completed the form at the request of the Middlesex County Prosecutor's Office with defendant's trial in mind. *See State v. Garthe,* 145 *N.J.* 1, 9, 678 *A.*2d 153 (1996) (noting "the official or business records exception is founded upon the theory 'that records which are properly shown to have been kept as required normally possess a circumstantial probability of trustworthiness, and therefore ought to be received in evidence' ") (quoting *Mahoney v. Minsky,* 39 *N.J.* 208, 218, 188 *A.*2d 161 (1963)).

Finally, Dr. Levine and Dr. Natarajan did not rely on the ViCAP database to either form or support their opinions, and therefore the database (whether hearsay or not) cannot be used to bolster these opinions. *See N.J.R.E.* 703. Agent Safarik testified that the ViCAP database is not available to defense counsel and is exempted from disclosure under the Freedom of Information Act. In *Fortin I* and *Fortin II,* we required the production of the underlying data supporting the opinion testimony of the State's expert investigative profiler. The purpose was to give defense counsel a "fair opportunity to test [the expert's] methods and credibility in the crucible of cross-examination." *Fortin II, supra,* 178 *N.J.* at 584, 843 *A.*2d 974. In this case, none of the State's experts relied on ViCAP to support his or her opinion on the uniqueness of the bite marks. Both Dr. Levine and Dr. Natarajan relied on their own professional experiences as an odontologist and medical examiner, respectively, when referring to the extraordi-

narily unusual nature of the bite-mark evidence. Unlike the motion judge, we do not know how the State could test the opinions of their experts against the ViCAP database. That database has not been reviewed by the State's experts and, apparently, is unavailable to them. Furthermore, the State could not use ViCAP as a reliable database to support its experts without making that database equally available to the defense.

Last, we acknowledge ViCAP's usefulness as an investigatory tool.[14] The New Jersey Legislature has recognized that ViCAP has an important role to play in assisting law enforcement agencies in identifying and apprehending dangerous criminals. *N.J.S.A.* 53:1–20.10. Nonetheless, law enforcement authorities frequently rely on investigative techniques and devices (e.g., polygraph examinations) and information obtained during investigations (e.g., anonymous tips) that are not admissible at trial. *See State v. Domicz*, 188 *N.J.* 285, 310–314, 907 *A.*2d 395 (2006) (affirming that polygraph evidence is inadmissible absent stipulation); *State v. Bankston*, 63 *N.J.* 263, 268, 271, 307 *A.*2d 65 (1973) (holding that hearsay tip explaining police officer's action not admissible unless declarant testifies). *See generally Trenkler, supra,* 61 *F.*3d at 57–59 (prohibiting introduction of database comprised of reports of bombings and arsons as hearsay even though relied on by law enforcement agencies). Ultimately, in conducting a fair trial, courts must ensure that only reliable evidence is submitted to our juries consistent with our evidentiary rules. As presented, ViCAP does not meet the standards for admissibility of evidence.

## VI.

For the reasons expressed, we affirm the motion judge's holding that without expert testimony explaining the unique similarities

---

[14] The ViCAP form states that its mission "is to facilitate cooperation, communication, and coordination between law enforcement agencies and provide support in their efforts to investigate, identify, track, apprehend, and prosecute violent serial offenders."

between the Gardner and Padilla sexual assaults, the Gardner assault is not admissible as signature-crime evidence. The experts in this case have testified that bite marks to the chin and breast inflicted during the Gardner and Padilla sexual assaults are highly unusual. Those experts must provide the database on which they relied to form their opinions. The State is permitted to show that the bite marks were inflicted in the course of a violent sexual assault. To minimize the potential prejudice of the presentation of that other-crime evidence, the court must give precise limiting instructions, explaining the permissible and prohibited uses of the bite-mark evidence and Gardner sexual assault. ViCAP as offered by the State is not admissible, either independently or as a database in support of expert testimony, to prove a signature crime.

We remand to the trial court for proceedings consistent with this opinion.

Justice RIVERA–SOTO, concurring in part and dissenting in part.

In large measure, I concur with the majority in this case, most notably in respect of the result reached. There are, however, differences in both analysis and scope that prevent me from fully joining the majority. I address our points of similarity and divergence separately.

## I.

A heinous crime has been committed here; the condition of Melissa Padilla's battered, forcibly raped and strangled body leaves no room to doubt that her death was the result of means most foul. The only issue in this case is one of identity: was defendant the actor who brutally sexually assaulted and murdered Padilla? Two separate sources of evidence answer that question. The first of these is Padilla's body that, through forensic proofs, bears witness not only to the crimes committed but to the identity of her murderer as eloquently as if she testified from the witness

stand. The second core source of evidence is Maine State Trooper Vicki Gardner, who was the victim of unspeakable crimes that, but for the fact that she survived, are identical to the crimes visited on Padilla. More importantly, however, Trooper Gardner can identify defendant as the person who committed those crimes on her. That identification is unassailable: defendant admitted his guilt to the attack on Trooper Gardner by his guilty pleas to those crimes.

Stripped to its essence in its now third appearance before this Court, this case presents the question whether and to what extent this victim is permitted to confront her accused murderer in the only way she now can, a consideration that must inform our analysis whenever we speak of "context" in this case.

## II.

I entirely endorse the conclusion set forth in Section III.A of the majority's opinion. That is, in the unique circumstances of this case, the admissibility of the bite-mark evidence as signature-crime evidence should be conditioned on the presentation by the prosecution of expert testimony connecting the "known" bite-marks—those defendant admittedly inflicted on Trooper Gardner—with the "questioned" bite-marks inflicted on Padilla, the victim of this murder. *Ante,* 189 *N.J.* at 597, 917 *A.*2d at 757 (2007). My agreement with that conclusion stems from the very *Rule* that permits expert opinion testimony; that is, we permit "scientific, technical, or other specialized knowledge [if it] will assist the trier of fact to understand the evidence or to determine a fact in issue[.]" *N.J.R.E.* 702. Because " '[t]he test of need for expert testimony is whether the matter to be dealt with is so esoteric that jurors of common judgment and experience cannot form a valid judgment as to whether the conduct of the party was reasonable[,]' " *Scully v. Fitzgerald,* 179 *N.J.* 114, 127, 843 *A.*2d 1110 (2004) (quoting *Butler v. Acme Markets, Inc.,* 89 *N.J.* 270, 283, 445 *A.*2d 1141 (1982)), and identifications using bite-marks are well outside a juror's common judgment and experience, expert testimony in that limited setting is required.

### III.

I do not agree, however, with the conclusion set forth in Section III.B of the majority opinion that, as a condition precedent to that required expert testimony, the State must "provide defendant with a database of cases supporting [that] expert testimony[.]" *Ante,* at 597–98, 917 *A.*2d at 757. I reject the now almost talismanic effect the term "database" has acquired in the two earlier iterations of this case, a brooding presence that permeates the majority's present analysis. *See State v. Fortin (I),* 162 *N.J.* 517, 745 *A.*2d 509 (2000); *State v. Fortin (II),* 178 *N.J.* 540, 843 *A.*2d 974 (2004).

Our *Rules of Evidence* clearly announce the conditions precedent to the qualification of an expert: to be qualified, the expert must possess "knowledge, skill, experience, training, or education" in the area of expertise. *N.J.R.E.* 702. *See also State v. Moore,* 122 *N.J.* 420, 458–59, 585 *A.*2d 864 (1991) (explaining, under prior rule, that "[a] witness qualifies as an expert ... if there is evidence of the required experience, training or education" (internal quotation marks omitted)); *State v. Odom,* 116 *N.J.* 65, 71, 560 *A.*2d 1198 (1989) (holding that "witness offered as an expert must, of course, be suitably qualified and possessed of sufficient specialized knowledge to be able to express such an opinion and to explain the basis of that opinion"). Thus, as a general proposition, a party proponent should not be required to produce a "database" *before* an expert is qualified to testify. All that should be required for expert qualification is what is set forth in the *Rules,* nothing more. To the extent *Fortin I* or *Fortin II* impose any additional burden on the qualification of an expert, I reject them.

However, even if qualified under *N.J.R.E.* 702, an expert is not permitted to tender an opinion that is not firmly tethered either to the facts in evidence or to data outside the record. *N.J.R.E.* 703. That, in a nutshell, is "the net opinion rule, which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data." *State v. Townsend,* 186 *N.J.* 473, 494, 897 *A.*2d 316 (2006). Stated differently, "the

net opinion rule 'requires an expert to give the why and wherefore of his or her opinion, rather than a mere conclusion.'" *Ibid.* (quoting *Rosenberg v. Tavorath*, 352 *N.J.Super.* 385, 401, 800 *A.2d* 216 (App.Div.2002)). The required "why and wherefore" may be satisfied without the production of a "database." Indeed, the experts here—a medical examiner and a forensic odontologist— certainly should be able to testify that, by virtue of their "knowledge, skill, experience, training, or education," they can identify the characteristics of a bite-mark and compare a "known" bite-mark, that is, one for which the bite pattern or methodology is known to come from a specific person, with a "questioned" bite-mark from someone not yet identified. In that setting, the reliance by an expert on a "database" speaks to the weight to be afforded the expert's testimony, and not its admissibility. Thus, again, to the extent *Fortin I* or *Fortin II* require any additional burden on the admissibility of an opinion by a qualified expert, I reject them.[1]

Responding to these concerns, the majority speaks exclusively of the testimony of Dr. Levine, the forensic odontologist, comparing the bite-marks on Padilla with defendant's dental impressions. Yet, it is deafeningly silent in respect of the testimony tendered by Dr. Natarajan, the medical examiner, who remarked on the uniqueness of these bite-marks based on her more than twenty-five years of experience as a coroner performing autopsies.

The issue presented boils down to this: what is required to allow those experts to opine that the bite-marks in this case are sufficiently unique to permit the identification of defendant as

---

[1] According to the majority, I have "dismantled an argument that is not even before the Court." *Ante*, at 599 n. 10, 917 *A.2d* at 758 n. 10. On the contrary, the foresight of this Court's imposition of a database required in *Fortin I* and *Fortin II* is precisely what is called into question in this appeal. In short, by engrafting into this case a condition precedent to the admissibility of evidence not otherwise based on our *Rules of Evidence* or decisional law, this Court's prior rulings extract from the trial court the fundamental exercise of evidentiary discretion our *Rules* properly vest in trial judges. For that reason, the trial court's attempt to apply an unfounded rule cannot be faulted.

Padilla's murderer? Nothing in the majority's reasoning overcomes the plain language of what we require as the basis for an expert's opinion. That is, it must be based on the expert's "knowledge, skill, experience, training, or education" in the area of expertise. *N.J.R.E.* 702. To claim that *N.J.R.E.* 705 empowers a trial court to demand the production of a database as a condition precedent to testimonial admissibility is an unwarranted expansion of that *Rule.* All *Evidence Rule* 705 requires is that the expert explain the basis for his or her opinion, the "net opinion rule" earlier described in the text. Indeed, that *Rule* allows an expert to testify based on hypothetical facts. If hypothetical facts are sufficient to support an expert's opinion, what then is the principled basis for focusing exclusively on the production of a factual "database" as a condition precedent to an expert's opinion? That is the abuse of discretion the majority overlooks and, parenthetically, one for which I do not fault the able trial judge, who merely sought to implement our earlier rulings.

In essence, the majority appears to require a "database" to prove the *probability* of the match between the assault on Trooper Gardner and Padilla's murder. Yet, "[h]istorically, statistical evidence has not been a prerequisite to the admission of matching samples." *State v. Noel,* 157 *N.J.* 141, 146, 723 *A.*2d 602 (1999). Analogously, "expert testimony about matching soil and hair samples has been deemed admissible, with the weight of the evidence left to the jury." *Ibid.* Moreover, this Court has emphasized that *"the production of a large quantity of comparable samples affects the weight, not the admissibility, of the evidence."* *Id.* at 147, 723 *A.*2d 602 (emphasis supplied). Thus, this case's historical obsession with a "database" as a condition to be satisfied before any matching can occur is unwarranted and without precedent.

## IV.

I concur in the result achieved in Section IV of the majority's opinion, but for reasons different than those announced. According to the majority, the other aspects of the brutal assault on

Trooper Gardner described by the majority should be admitted because "[p]lacing the bite-mark evidence in context will permit the jury to better fulfill its truth-seeking function." *Ante*, at 600, 917 *A*.2d at 758. Yet, while the majority admits into evidence the details of the assault on Trooper Gardner as providing "context" for that assault, I am of the view that *all* of the facts of defendant's assault on Trooper Gardner should be admissible for identification purposes, as additional points of comparison between the "known" assault on Trooper Gardner and the "questioned" assault on Padilla.

That a larger universe or more numerous constellation of similar factors between two separate events greatly aids in determining whether the events were performed by the same actor is so intuitive that it eschews the need for authority. It is self-evident that the greater the number of points of comparison available, the more reliable the identification made therefrom. It is for that specific reason that we allow for the admission of evidence of other crimes in order to prove the identity of the actor, *N.J.R.E.* 404(b), particularly when, as here, "the crimes were committed in so distinctive and unusual a manner that they may be said to be the handiwork of the same person[,]" *ante*, at 594, 917 *A*.2d at 755. In that setting, allowing the non-bite-mark aspects of the "known" assault on Trooper Gardner to be used not only for context but substantively in determining whether the same person also assaulted and murdered Padilla only enhances the reliability of the identification ultimately made, something that inures to the betterment of both defendant and the State and produces a result in harmony with the truth-seeking function of this trial.

There is no principled analytical difference between the use of signature-crime factors to prove identity and, for example, the use of fingerprints to prove identity. In fingerprint analysis, up to one hundred points of comparison between a "known" print and a "questioned" print can be established. *United States v. Mitchell*, 145 *F*.3d 572, 575 (3d Cir.1998). Despite that number, identity can be determined reliably by as few as seven points of comparison.

*Ibid.*[2] It certainly goes without saying that any points of comparison in addition to the applicable minimum only can enhance the reliability of the identification. For that reason, once a fundamentally reliable match is made—in this case, bite-mark to bite-mark, or as in fingerprints, once the minimum points of comparison are determined—all remaining identifying factors should be admissible to enhance the reliability of the proof of identity, and not just by way of context.[3] *See United States v. Clemons,* 32 *F.*3d 1504, 1508–09 (11th Cir.1994), *cert. denied,* 514 *U.S.* 1086, 115 *S.Ct.* 1801, 131 *L.Ed.*2d 728 (1995) (rejecting defendant's claim that his prior similar crimes were not admissible to prove identity because they were not sufficiently peculiar or idiosyncratic to amount to signature crimes, and considering *all* points of similarity between the two crimes); *United States v. Miller,* 959 *F.*2d 1535, 1539 (11th Cir.), *cert. denied,* 506 *U.S.* 942, 113 *S.Ct.* 382, 121 *L.Ed.*2d 292 (1992) (holding that totality of the prior similar crime was admissi-

---

[2] Although the Federal Bureau of Investigation requires twelve points of comparison for a positive identification, *Hall v. DiPaolo,* 72 *F.*3d 243, 245 n. 1 (1st Cir.), *cert. denied,* 518 *U.S.* 1010, 116 *S.Ct.* 2535, 135 *L.Ed.*2d 1058 (1996), "[t]he International Association of Identification Officers considered, according to the testimony, that eight to twelve characteristics as points of comparison are sufficient to be a valid basis for drawing a conclusion[,]" *Schleicher v. Wyrick,* 529 *F.*2d 906, 909 (8th Cir.1976).

[3] The majority seeks to distinguish the comparisons made using fingerprints by noting that fingerprint evidence is tendered by experts and thus asserting that, somehow, it makes a difference. *Ante,* at 602 n. 12, 917 *A.*2d at 759 n. 12. I do not agree. For example, even if a fingerprint expert testifies that he or she has made a positive identification of a defendant based on fingerprint comparisons, that cannot suffice to bar from the jury's consideration additional testimony that the defendant was of a specific height, weight, build, complexion, or ethnic background, or that the defendant wore distinctive clothing or jewelry, or that the defendant displayed other identifying physical characteristics. *All* of those factors aid in making the identification more reliable and a proper identification should be based on the aggregate of the factors. The majority cannot contend that any of those non-expert factors also must be vouchsafed by an expert or that a "database" in respect of those identifying characteristics is required as a condition precedent to any testimony. That is the point pressed here, one that remains unanswered by the majority.

ble to prove identity despite many aspects of prior crime were not independently sufficiently peculiar to prove identity).

## V.

I address last the admissibility of the comparisons run through the FBI's Violent Criminal Apprehension Program (ViCAP). The trial court refused to admit those comparisons, ruling that ViCAP was not properly crafted as an identification device and that it did not meet the requirements for admission as an exception to the hearsay rule. The majority concludes that the ViCAP proofs, standing alone, do not qualify under the business records exception to the hearsay rule, *N.J.R.E.* 803(c)(6), or under the public records exception to that rule, *N.J.R.E.* 803(c)(8). *Ante,* at 604, 917 *A*.2d at 761.

If the prosecution, without more, separately offers either the ViCAP system as a whole or the single ViCAP form generated in respect of the assault on Trooper Gardner, I agree with the majority that such evidence, standing alone, is inadmissible hearsay. However, if either the ViCAP system or any of its components is used by a properly qualified identification expert in generating an opinion, the hearsay rule is inapplicable provided the information is not offered for the truth of the matter asserted, *N.J.R.E.* 801(c), and the information is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject[,]" *N.J.R.E.* 703. *See Ryan v. KDI Sylvan Pools, Inc.,* 121 *N.J.* 276, 289, 579 *A*.2d 1241 (1990) (holding that "a court [must] make an inquiry into and a finding on whether experts in the given field rely on certain information. If such reliance be found, then it is presumed to be reasonable"). To the extent the majority's holding is so sweeping as to disallow all uses of the ViCAP evidence, including any proper non-hearsay use, I must dissent.

*For affirmance as modified/remandment*—Justices LONG, LaVECCHIA, ZAZZALI, ALBIN and WALLACE—5.

*Concur in part/dissent in part*—Justice RIVERA–SOTO—1.